UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHNNY SALDATE, ) | 1:07-CV-00309 AWI GSA HC |
| ) | |
| Petitioner, ) | ORDER DECLINING TO ADOPT FINDINGS |
| ) | AND RECOMMENDATION |
| ) | [Doc. #11] |
| v. ) | |
| ) | ORDER GRANTING PETITION FOR WRIT |
| ) | OF HABEAS CORPUS |
| DERRAL ADAMS, Warden, ) | |
| ) | ORDER DIRECTING CLERK OF COURT |
| Respondent. ) | TO ENTER JUDGMENT |
| ) | |

Petitioner Johnny Saldate is a state prisoner serving an indeterminate sentence of 15 years to life for second degree murder. Petitioner has been imprisoned since September 1986. Petitioner is proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is represented in this action by counsel. Petitioner challenges the California Board of Parole Hearings ("BPH")'s denial of parole at the conclusion of a January 23, 2006, parole suitability hearing.

On March 28, 2008, the Magistrate Judge issued a Findings and Recommendation that recommended the petition be DENIED with prejudice. The Magistrate Judge further recommended that the Clerk of Court be DIRECTED to enter judgment. The Findings and Recommendation was served on all parties and contained notice that any objections were to be filed within thirty (30) days of the date of service of the order.

On March 31, 2008, Petitioner filed objections to the Findings and Recommendation. In

1

accordance with the provisions of 28 U.S.C. § 636(b)(1)(C), this Court has conducted a *de novo* review of the case. Having carefully reviewed the entire file and having considered the objections, the Court respectfully declines to adopt the Magistrate Judge's Findings and Recommendation.

## **LEGAL STANDARD**

When a petitioner is imprisoned from a state court adjudication and files a federal habeas petition after April 24, 1996, AEDPA governs and a court will not issue a writ of habeas corpus unless it is shown that the state court decision denying relief was "contrary to, or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U. S. C. § 2254(d)(1); Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007); Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1127 (9th Cir. 2006).

California Penal Code § 3041 vests all California prisoners "whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons, 505 F.3d at 850; see Sass, 461 F.3d at 1128; Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003). Well before 2006, "the Supreme Court had clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise arbitrary.'" Irons, 505 F.3d at 851; see Sass, 461 F.3d at 1128; Biggs, 334 F.3d at 915. The "some evidence" standard "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the decision . . . ." Superintendent v. Hill, 472 U.S. 445, 455-56 (1985); Sass, 461 F.3d at 1128. State statutes and regulation concerning parole suitability frame the "some evidence" analysis. Irons, 505 F.3d at 851. Therefore, courts "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle

articulated in *Hill*." Id.

Under California law, with respect to an eligible "life prisoner," the BPH "must 'normally set a parole release date' before the minimum term has been served," but "an inmate shall be found unsuitable for parole and denied parole if, in the judgment of the [BPH], the prisoner will *pose an unreasonable risk of danger to society if released from prison*." Id. (quoting In re Dannenberg, 34 Cal.4th 1061, 1078, 1080 (2005) (quoting 15 C.C.R. § 2402(a))) (emphasis added). The BPH determines whether a prisoner is presently too dangerous to be released on parole by examining criteria set forth in regulations. See 15 C.C.R. § 2402; Irons, 505 F.3d at 851-52; Biggs, 334 F.3d at 915-16. The criteria set by regulation reads:

> (b) All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.
>
> (c) The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>   (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>     (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>     (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>     (C) The victim was abused, defiled or mutilated during or after the offense.
>     (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>     (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
>   (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>   (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
>   (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
>   (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

>> (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.
>
> (d) The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:
>
>> (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
>> (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.
>> (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
>> (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.
>> (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
>> (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.
>> (7) Age. The prisoner's present age reduces the probability of recidivism.
>> (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
>> (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.
>
> 15 C.C.R. § 2402(b), (c), (d).

"[T]he overarching consideration in the suitability determination is whether the inmate is currently a threat to public safety." In re Gray, 151 Cal.App.4th 379, 410 (2007); In re Weider, 145 Cal.App.4th 570, 589 (2006); see also In re Elkins, 144 Cal.App.4th 475, 499 (2006). "The test is not whether some evidence supports the reasons . . . cite[d] for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." In re Lee, 143 Cal.App.4th 1400, 1408 (2006); see also In re Burdan, 161 Cal.App.4th 14, 31 (2008); In re Roderick, 154 Cal.App.4th 242, 263 (2007). The denial of parole will not be upheld where the BPH "attaches significance to evidence that forewarns no danger to the public or relies on an unsupported conclusion." In re Tripp, 150 Cal.App.4th 306, 313 (2007).

4

"Where the nature of the commitment offense is used as a basis for denying parole, the requirement that the offense be particularly egregious is meant to convey 'only that the violence or viciousness of the inmate's crime must be more than minimally necessary to convict him of the offense for which he is confined." Burdan, 161 Cal.App.4th at 29 (quoting Dannenberg, 34 Cal.4th at 1095). Recently, a California Court of Appeals has indicated that the commitment offense alone will not support a denial of parole where: "(1) a significant period of time has passed since the crime; (2) there is uncontroverted evidence of the inmate's rehabilitation; and (3) the crime was not committed in such an especially heinous, atrocious, or cruel manner so as to undermine the evidence that the inmate's rehabilitative efforts demonstrate he no longer would be a danger to society if released . . ." In re Singler, 161 Cal.App.4th 281, 301 (2008). The continued reliance on an unchanging factor, such as the commitment offense or conduct prior to prison, alone and regardless of the extent of rehabilitation demonstrated, will at some point violate due process given the liberty interest that flows from California's statutes. See Irons, 505 F.3d at 854; Biggs, 334 F.3d at 917.

In reviewing whether "some evidence" exists to support the BPH's decision, it is "inappropriate for courts to salvage the [BPH's] inadequate findings by inferring factors that might have been relied upon. At minimum, the [BPH] is responsible for articulating the grounds for its findings and for citing evidence supporting those grounds." Burdan, 161 Cal.App.4th at 31; Roderick, 154 Cal.App.4th at 262; see also In re DeLuna, 126 Cal.App.4th 585, 593-94 (2005).

### BACKGROUND[1]

On January 23, 2006, the BPH refused to set a parole date for Petitioner and found that he posed an unreasonable risk of danger to the community. This was Petitioner's fifth parole suitability hearing.[2]

The factual background of the offense described by the BPH was:[3]

---

[1] For a recitation of the procedural posture of this case, see the Findings and Recommendation at pages 1 to 2.

[2] Petitioner informs the Court that he was denied parole for a sixth time in 2007. However, that decision is not before the Court. See Irons v. Carey, 505 F.3d 846, 850 n.1 (9th Cir. 2007).

[3] The BPH relied on the June 2005 Correctional Counselor's report for this factual recitation. See Transcript at 12.

5

> On September 26, 1986, at approximately 1:30 hours, two Mexican males entered the 7-11 store . . . in an attempt to purchase beer. Vance Kaufman, the store clerk, asked them for identification. They could not produce identification so Mr. Kaufman refused to sell them beer. There was a short exchange of words. One of the subjects threw food items at Mr. Kaufman. The subjects then left the store and were followed by Mr. Kaufman. A few moments later, a passerby ran into the store and told the manager that Mr. Kaufman was lying in the street. {By the time the police and paramedics arrived at the scene, Vance Kaufman was dead having died as a result of multiple stab wounds.}[4]  A few days following Kaufman's death, the police received information through an anonymous phone call that [Petitioner] was the individual who stabbed Kaufman. On September 29, 1986, [Petitioner] was taken into custody and, after being advised of his rights, admitted he had stabbed Kaufman. . . . According to [Petitioner], he had been drinking all evening with his friends at his friend's cousin's house. On their way back to his friend's house, some of the friends decided to go to the liquor store. A few moments later, [Petitioner] decided to follow them to the 7-11 store and when he saw them come out of the [store], he first attempted to leave and go back to his friend's house as there did not appear to be any problems. According to [Petitioner], he then looked back and saw his friend[5] fighting with someone. [Petitioner] pulled out his knife and ran to where the fight was going on and stabbed individual numerous times. After the fighting stopped, [Petitioner] stated that he and his friends ran from the area. [Petitioner] admits guilt and states that he is remorseful for the death of the victim in the commitment offense.

Petition at Exhibit A ("Transcript") at 13-15.[6]

The BPH explained that it found Petitioner posed an unreasonable danger to the public for several reasons. First, the BPH relied on the commitment offense and found that the offense: (1) was committed in an especially cruel, callous, and heinous manner in that Petitioner attacked an unarmed man; (2) the offense was carried out in a dispassionate and calculated manner in that Petitioner was armed with a knife prior to the commission of the murder; (3) the murder showed an exceptionally callous disregard for human suffering in that Kaufmann must have suffered unimaginable physical and emotional trauma as a result of being stabbed multiple times, including in the jugular vein; and

---

[4] This sentence was not part of the BPH factual recitation. It comes from the 1986 Fresno County Probation report, which appears to be the basis for the Correctional Counselor's report. See Answer Exhibit 3 at pp. 12-14. The Court includes this sentence to clarify that Kaufman died sometime at the scene as a result of his stab wounds.

[5] The petition and answer indicate that it was Petitioner's cousin who was fighting. Since it is immaterial whether the fighter was Petitioner's friend or cousin, the Court will use the BPH's characterization.

[6] The State's answer spends most of its pages arguing that there is no clear federal law, as established by the Supreme Court that California inmates have a liberty interest in parole. The Ninth Circuit has rejected, and continues to reject, this argument. See Castle v. Woodford, 2008 U.S. App. LEXIS 11668, *1 (9th Cir. May 27, 2008); Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007); Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2003). The State then argues that Petitioner is trying to improperly re-weigh evidence, contends that *Biggs's* warning about continued reliance on unchanging factors to deny parole has been disavowed in *Irons* (this is incorrect), and contends that, in addition to the commitment offense, the BPH properly relied on Saldate's unstable social history, his use of drugs and alcohol, and the opposition of the district attorney.

6

(4) the motive for the crime was trivial since it was committed as a result of a confrontation involving a clerk who would not sell beer to Petitioner's minor friends. See Transcript at 86-87. Second, the BPH relied on Petitioner's juvenile record and that Petitioner had failed to profit from society's previous attempts at correction. See id. at 88. Third, the BPH stated that Petitioner had an unstable social history that included: (1) arrests or petitions for throwing a substance at a vehicle, public intoxication, petty theft, malicious mischief, and attempted burglary; (2) a history of using marijuana, PCP, LSD, and alcohol; and (3) gang affiliation both in prison and in the community. See id. Fourth, the BPH noted the opposition of the District Attorney. See id. at 90.

Though not in support of its decision to deny parole, the BPH noted that Petitioner: (1) had upgraded educationally and vocationally; (2) not had a serious disciplinary infraction since 1989; (3) had a 2004 psychological assessment that was positive and indicated Petitioner posed a less than average risk of danger if released; (4) had very good parole plans, including places to live and offers of employment; and (5) had successfully completed several self-help programs, including an anger management program and Alcoholics Anonymous ("AA"). See id. at 88-91.

The Fresno County Superior Court was the only court to not summarily deny Petitioner's state habeas application. The analysis of the Superior Court is very short and tracks that of the BPH: "In this case, the Board took into consideration petitioner's progress and compared it to the nature of the crime, petitioner's unstable history, his criminal record, his background of drug and alcohol use, his current absence from the AA program,[7] and his prior gang associations. Since some evidence exists to support the Board's findings, the petition is denied." Answer Exhibit 5.

## DISCUSSION

After reviewing the record, at least "some evidence" supports some of the Superior Court's

---

[7] It does not appear that the BPH relied on Petitioner's current absence from AA to deny parole. See Transcript at 86-91. The BPH did note Petitioner's absence, but did so in the context of recommendations for future parole hearings. See id. at 91. At the hearing, Petitioner indicated that the last time he had alcohol was "pruno" in 1988, that he missed one AA meeting (which resulted in his ejection from the program) due to a change in work and sleep schedules, that he is currently on the list to get back into AA but is number 14 on that list, and that he has found AA type organizations and a sponsor outside of prison. See id. at 25-26, 38-39, 57-58, 64, 67. None of this testimony was contradicted. In light of the above, especially that the BPH did not list Petitioner's absence from AA as a basis for denying parole, cf. Burdan, 161 Cal.App.4th at 161; Roderick, 154 Cal.App.4th at 262, Petitioner's absence from AA is not some evidence of unreasonable danger.

7

conclusions and the findings made by the BPH.  Petitioner had an unstable social history.  The regulations define "unstable social history" as meaning "unstable or tumultuous relationships with others."  15 C.C.R. § 2402(c)(3).  Although Petitioner's juvenile crimes and his history of using PCP, marijuana, and alcohol are not "relationships with others,"[8] Petitioner was a member of a gang both inside and outside of prison.  See Exhibit 3 at pp. 25, 27.  Gang involvement in prison led Petitioner to commit acts of violence against other prisoners.  See id. at 68-71.  This is some evidence of unstable or tumultuous relationships with others.

There also is some evidence to support the BPH's conclusion that Petitioner had not benefitted from previous attempts at correction.  Petitioner's juvenile record indicates that he was placed on probation and had portions of sentences suspended.  Despite this experience, Petitioner continued to drink and engage in schemes to illegally obtain alcohol, which ultimately resulted in the tragic death of Kaufmann.  Although this consideration is not expressly enumerated in either § 2402(c) or (d), the BPH was entitled to generally consider "all relevant information" and "past criminal history."  15 C.C.R. § 2402(b).

The BPH also correctly noted that the district attorney opposed giving Petitioner a parole date.  However, while the Board may consider this opposition, "voiced opposition to parole is not an enumerated unsuitability factor . . . and such argument is not evidence of unsuitability."  In re Viray, 161 Cal.App.4th 1405, 1417 (2008).

Finally, the BPH found that the nature of Petitioner's crime was especially cruel, heinous, or callous.  However, in *Viray*, the California Court of Appeals reviewed the Governor's reversal of the BPH's granting of a parole date to a second degree murderer.  The facts of Viray's crimes were similar to Petitioner's:

> On the night of February 14, 1982, 27-year-old Viray went to a nightclub with several of his friends carrying a large knife in his waistband.  While on the dance floor, Victor Gonzales Cacha bumped into Viray several times and kicked him. Viray felt intimidated, drew his knife and stabbed Cacha once or twice in the chest. Viray continued to stab Cacha after the men fell to the floor. Someone took the knife away from Viray, but one of Viray's friends grabbed the knife and fled the nightclub with

---

[8]The BPH could consider Petitioner's use of PCP, marijuana and alcohol use, especially given the role that alcohol played in the commitment offense, under 15 C.C.R. § 2402(b)'s broad inclusion of allowing consideration of "all relevant information."

8

> Viray. Cacha suffered stab wounds to each arm, left thigh, heart and lung and died from his injuries.

Viray, 161 Cal.App.4th at 1410.

The Court of Appeals determined that the Governor relied on the facts of the commitment offense alone in reversing the BPH decision and then analyzed whether Viray's crime exhibited a callous disregard for suffering or was especially aggravated because of the extremely violent nature of the attack. See id. at 1417. The Court of Appeals determined:

> There is no evidence that Viray committed the crime in a manner that demonstrated an exceptionally callous disregard for human suffering. The initial stabbing to Cacha's chest was quick, followed by a scuffle while Cacha was on the ground whereby he suffered additional stabbings. Nothing about the crime demonstrated an exceptionally callous disregard for human suffering, such as taunting or torturing the victim. The fact Viray left the scene of the crime does not show that the crime itself was done in an exceptionally callous manner.
>
> While the attack was unquestionably violent, as are most murders, there is no evidence suggesting that the crime was more violent than minimally required to sustain a second degree murder conviction. As other courts have noted, "'[s]econd degree murder is defined as the unlawful killing of a human being with malice aforethought'" and all second degree murders involve some amount of viciousness or callousness to satisfy the malice requirement. Although the Governor suggests that the crime was especially aggravated because it involved multiple stab wounds, there is no evidence showing that the first wound Viray inflicted was sufficient to kill the victim. Stated differently, without multiple stab wounds there may have been no murder. Accordingly, there is no evidence showing this particular second degree murder was especially aggravated.

Id. at 1418 (citations omitted).

The Court of Appeals did find that the motive for Viray's crime was trivial in relation to the offense. Id. However, the Court of Appeals determined that this finding did not support a conclusion that Viray would pose an unreasonable risk of danger if paroled:

> Viray committed a violent and impulsive act while intoxicated and has had over 24 years in prison to reflect on his actions. He has made commendable rehabilitative gains and is ready to be reintegrated into society and serve the remainder of his sentence outside prison walls. Because we find no support in the record suggesting Viray would pose a threat to public safety if released, it serves no purpose to remand this matter to the Governor to permit him to reconsider his decision.

Id. at 1419.

In the case at bar, the BPH noted that Kaufman was unarmed. However, so was victim in *Viray*. See Viray, 161 Cal.App.4th at 1410. The BPH also noted that Petitioner was armed with a knife prior to the offense. However, Viray was also armed with a knife prior to his offense. See id.

9

Further, simply being armed with a knife prior to a crime does not in itself show dispassion or calculation "such as an execution style murder." Cf. 15 CCR § 2402(c)(1)(B). In this case, the undisputed evidence indicates that Petitioner attacked and killed Kaufman after Kaufman followed Petitioner's friend out of the store and fought. While the entire confrontation stemmed from a misguided plan to illegally obtain beer, Petitioner murdered Kaufman because Kaufman was fighting with Petitioner's friend. Given that Petitioner had been drinking prior to the offense (like Viray), the evidence indicates that the tragic killing of Kaufman was more spontaneous than calculated. The BPH also stated that the offense showed a callous disregard for human suffering in that Kaufman must have experienced unimaginable physical and emotional trauma due to the multiple stab wounds, including being stabbed in the neck. However, Viray also inflicted multiple stab wounds on the victim, Cacha. See Viray, 161 Cal.App.4th at 1410. Also as in *Viray*, there appears to be little known about the wounds inflicted and there is no evidence of how long Kaufman was alive or whether or how long he suffered given the wounds inflicted. While a wound to the jugular vein is no doubt extraordinarily serious, it is unknown how deep the wound was, if this was the wound that killed Kaufman, or whether Kaufman was dead prior to that wound being inflicted. All that is known is that Petitioner stabbed Kaufman numerous times and Kaufman died as a result.[9] Finally, the BPH noted that the motive for Kaufman's death was trivial because it was committed as a result of a confrontation involving a clerk who would not sell his underage friends beer. It is true that the confrontation evolved from the rightful refusal to sell beer to underage individuals. However, the evolution of the offense was not the motive. The record does not reflect that the reason Petitioner killed Kaufman was because Kaufman refused to sell beer, rather, as discussed above, the reason that Petitioner killed Kaufman was that Kaufman was fighting with Petitioner's friend. There is no description of the relative sizes of Kaufman and Petitioner's friend, nor is there a description of how violent the fight may have been, but the record indicates that Petitioner was acting in the misguided defense of another. In light of the above, and especially the analysis of *Viray*, there is not some evidence to support the BPH's finding that the offense was committed in an especially heinous,

---

[9] The Court is in no way trying to minimize Kaufman's tragic death.

atrocious or cruel manner.  See 15 CCR § 2402(c); Viray, 161 Cal.App.4th at 1410, 1418-19; see also Burdan, 161 Cal.App.4th at 31-32; Lee, 143 Cal.App.4th at 1411-12.

Accordingly, of the enumerated factors, there is some evidence only of Petitioner's history of unstable social relationships and his prior juvenile record/failure to benefit from prior attempts at correction.  However, it is not enough that some evidence supports the BPH's individual findings, rather, there must be some evidence that supports the ultimate conclusion that Petitioner would pose an unreasonable risk of danger if released.  See Burdan, 161 Cal.App.4th at 28, 31; Tripp, 150 Cal.App.4th at 313; Lee, 143 Cal.App.4th at 1408.  That is, there must be some evidence that Petitioner *currently* poses an unreasonable risk.  See Gray, 151 Cal.App.4th at 410;  Weider, 145 Cal.App.4th at 589; Elkins, 144 Cal.App.4th at 499.  The considerations upon which the BPH relied during the January 2006 hearing are past, unchanging factors that are not recent.  Petitioner began the process of extricating himself from the prison gang in 1990 and the process apparently ended successfully in 1993.  See Transcript at 27, 63-64.  There is no evidence that Petitioner currently is a member of any gang.  Further, all of Petitioner's past offenses and the previous attempts to rehabilitate Petitioner occurred prior to August 1986 while Petitioner was a juvenile.[10]  In other words, the parole board relied on conduct that occurred between 16 and 20 years before the hearing when it determined that Petitioner currently poses an unreasonable danger to society.  The Court fails to see how this past conduct supports a finding the petitioner *currently* poses an unreasonable risk of danger to the public, especially in light of Petitioner's conduct from 1990 onwards.  Cf. Roderick, 154 Cal.App.4th at 277.

The evidence at the BPH hearing showed that Petitioner is remorseful over his crime.  See Transcript at 14, 49.  Petitioner has improved himself educationally and vocationally.  See 4, 34-35, 52-54, 88-89. Petitioner has formed meaningful relationships with his family while in prison, and in particular his formerly estranged father.  See id. at 21-23, 29, 33-34, 37, 43-47, 64, 66.  Petitioner's juvenile crimes were not crimes of violence.  Cf. id. at 16-17, 88 with In re Scott, 133 Cal.App.4th 573, 602 (2005).  Petitioner's last significant disciplinary infraction was in 1989.  See Transcript at

---

[10] Petitioner's date of birth is August 12, 1968.  Exhibit 2.

62, 89-91. Petitioner has held several jobs within prison and recently received an excellent assessment from his supervisor. See id. at 54-57, 61, 64, 89. Petitioner has also completed anger management classes and has actively participated in AA and narcotics anonymous. See id. at 57-61, 63. The last time that Petitioner consumed alcohol was in 1988, and it appears that Petitioner has remained clean and sober ever since. See id. at 25-26, 63-64. Petitioner has made arrangements to attend AA-type support groups outside of prison and has found a sponsor. See id. at 38-42. At the time of his offense, Petitioner had been drinking alcohol and had turned 18 years of age just a little over one month prior. See id. at 13, 20. Petitioner had very good parole plans, including two job offers and places at which to live. See id. at 33-34, 63, 89-90. Petitioner had no history of mental illness. See id. at 3-4. Petitioner had reduced his classification score from 49 to 33. See id. at 51. Finally, the 2004 psychological evaluation was very positive and indicated that Petitioner posed a risk of danger to the public that was less than the average member of society.[11] See id. at 63-66, 89.

It is not this Court's place to re-weigh evidence. However, given the stale age and nature of the prior, unchanging conduct upon which the BPH relied, as well as the Petitioner's young age when this conduct occurred, some evidence is required to lend support to the conclusion that Petitioner *currently* poses an unreasonable risk. See Gray, 151 Cal.App.4th at 410; Weider, 145 Cal.App.4th at 589; Elkins, 144 Cal.App.4th at 499. This is especially true since the 2006 parole hearing was the fifth hearing in which Petitioner was denied parole, and Petitioner has served more than the minimum 15 years in prison. Cf. Irons, 505 F.3d at 853-54; Biggs, 334 F.3d at 917. Despite the need for additional and/or more current information, the only other evidence supports the conclusion that Petitioner has rehabilitated and does not currently pose an unreasonable risk of danger to the public. Therefore, the Court cannot conclude that "some evidence" supports the BPH's

---

[11] Part of the psychological assessment read:

[Petitioner] has an understanding of the factors that were at play at the time of his crime life and he has made a significant change in the way that he conducts himself on a daily basis. He holds himself responsible for his behavior and has demonstrated the capacity to abide by institutional rule and regulation. He has evolved an appreciation of life and developed a sense of ethics and morals that reflect the expectation of a general society.

Transcript at 65-66; cf. In re Smith, 114 Cal.App.4th 343, 369 (2003) (criticizing rejection of psychologist's report in absence of contrary evidence of dangerousness).

determination that Petitioner currently poses an unreasonable risk of danger to the public. The Superior Court's ruling that upheld the BPH's decision to deny Petitioner parole violated due process.

Accordingly, IT IS HEREBY ORDERED that:

1. The Court declines to adopt the Findings and Recommendation of the Magistrate Judge;
2. Petitioner's writ of habeas corpus is GRANTED; and
3. Within thirty (30) days of service of this order, the California Board of Parole Hearings must calculate a term for Petitioner in accordance with the requirements of California Penal Code § 3041, with credit for time since the January 23, 2006, decision as if parole date had been granted, and any other term credit to which he is entitled by law.

IT IS SO ORDERED.

Dated:   **July 10, 2008**                                   **/s/ Anthony W. Ishii**
                                                            CHIEF UNITED STATES DISTRICT JUDGE